Good morning, Your Honor. May it please the Court, my name is Georgia McMillan. I represent Jerome Vierra, the defendant appellant in this matter. Appellant reserves one minute rebuttal time. Your Honors, this appeal involves one issue, whether or not the District Court, the Honorable Helen Gilmore, erred when she denied Mr. Vierra's motion for sentencing entrapment when he was sentenced. Mr. Vierra was indicted on six counts of distribution of methamphetamine. At trial, his defense was legal entrapment. The jury convicted him and he proceeded to sentencing. At sentencing, he made a motion for, among other motions, the motion at issue in this appeal was a motion for sentencing entrapment. In sentencing entrapment... In your argument, were you basing your argument for reduction based on sentencing entrapment on the application of guidelines themselves or on the consideration generally of the 355-3 factors? It's a combination, Your Honor. It's both the guidelines and the 355-3A factors. And at that, at sentencing... Is there a difference? I think that they both play together, Your Honor. The guidelines permit sentencing entrapment. The guidelines express the sentencing commission's policy to acknowledge that the government may set up and structure these deals with such unfavorable terms that a defendant who may be predisposed to commit a lesser crime is entrapped into committing a greater crime with greater punishment. Sentencing entrapment, Your Honor. Sentencing entrapment, the defendant carries the burden of showing by a preponderance of the evidence that he was predisposed only to commit the lesser crime. Our argument in our brief, and I'm at the sentencing hearings, was that the record is uncontradicted that before these six deals occurred, the first one beginning in November 2004, the uncontradicted record shows that Mr. Vieira only committed deals involving small user amounts of no more than a half gram. We think that the record is clear on this, Your Honors. Does the record show that he only engaged in those transactions with friends as opposed to strangers? The record shows that he engaged with friends, yes, that's correct, Your Honor. What difference does it make? Drugs are harmful, drugs are taken, what difference does it make with friends or whatever? It makes a significant difference with respect to applying the doctrine of sentencing entrapment. And so this defendant could forever in his life deal all the drugs he wants, but he's the lowest level dealer. After the first deal, where he dealt in more than what he'd been dealing before, he dealt six of them all together. So after the first one, did he convert himself into a higher class dealer? No, Your Honor, and we acknowledge that the six deals is a troubling aspect of this case. Very troubling. To that we say, Your Honor, that this Court's clear case law, represented in Naranjo and in the case Stauffer, clearly establishes a theory of sentencing entrapment. Moreover, Section 355.3A establishes that the sentencing court should consider the nature and circumstances of the defendant and the offense. And this is where the sentencing entrapment comes in, Your Honors. Before these deals that occurred, the first one in November 2004, the record shows that he was only dealing in these small user amounts of a half-pound of paper, which the record shows costs no more than $20, provides two hits to the user. He engaged in these amounts to fuel his own drug addiction, Your Honor, not to be involved in distributing ice throughout the North Shore and to be some sort of kingpin or even a lesser kingpin of drug trafficking. He didn't have to go to the next level. Nobody forced him to go to the next level. No one forced him to go to the next level. However, we have the troubling aspect of the snitch EPO in this case, Your Honor. Now, this snitch was manipulative. He was coercive. And the record shows that throughout these six deals, it was a period from November 2004 to September 2005, the snitch EPO was also trafficking in marijuana. Now, my client is tragically a drug addict. And he noted in the record in his trial testimony, he said that he needed the marijuana as much as he needed the ice. And so the government is employing this snitch EPO who is getting Mr. Vieira involved in these six deals while simultaneously continuing to feed his marijuana habit. So because he's a drug addict, he is infirmed from committing a greater crime? No, not necessarily, Your Honor. But what I wanted to add, this troubling aspect of this particular snitch is not only is he dealing in drugs throughout, and the government knows it. By the way, Your Honors, the government only deactivated this snitch EPO two days before the trial of my client began on November 22, 2007. The government deactivated him? Excuse me? The government deactivated him? Stopped using him. They only stopped using him two days before the trial of my client on November 22, 2007. They say in trial testimony of the government's agents that they deactivated him because he continued to traffic in marijuana and also because he stole some money from one of the sales. However, they knew that he was trafficking in marijuana throughout. What I wanted to mention is that EPO says himself in his trial testimony, he says, you know, I don't know why Mr. Vieira and the other defendants in this case kept dealing with me and providing him with ice. And then he opines. He says, maybe it was because they owed me half the time. And I submit that this is a troubling aspect of this case, that not only is this snitch fueling an addiction of these defendants, my client as well, but as well, he appears to be creating debt, which requires these defendants to continue engaging in the transactions. I go back to my previous comment. So you're an addict, and so you owe money. So that means you're incapable of creating a person who can commit a greater crime. I owe money. I'm taking drugs. Therefore, I can sell all drugs I want because I'm incapable of making that determination. It's my habit. That is in our interpretation of the record, Your Honor. Well, what's the principal difference between six transactions and 20 with respect to the argument you're making now? Or 30 or 50? Your Honor, the case law provides us with sentencing entrapment. I understand. But your argument is they owed him money. Presumably it would continue in the future. So you're saying that this wasn't a one-time, two-time, three-time event, six-time event. It was indefinite, potentially. How does that help you? I would not say that it's potentially indefinite. Indeed, Jerome Vieira cut off supplying ice to the snitch EPO after the sixth deal in September 2005. Does it have to do with how long the government is involved in creating this and continuing it? That's part and parcel of the sentencing entrapment theory. Well, isn't it up to the government if their theory is entrapment? If the government wants it to continue for 50 sales, it would. If it wants to cut it off after three, it would. Yes, Your Honor. And that's the troubling aspect of sentencing entrapment. And one of the reasons behind this court adopting the theory and the doctrine in our circuit is that the troubling aspect of this is that the government can structure these deals. The government, in fact, did structure these deals. The government decided to have EPO, their snitch, go out and acquire one- and two-ounce amounts. And to answer Judge Grunetti's question, if he were doing this on his own, not being entrapped by the government, as is your theory, then this would not be a defense in any way to sentencing or anything else. It's only because of the government's participation. I'm not sure you understand. Your client just decided to graduate to the next step. You would have no defense to the ordinary sentencing. All right, let me ask you one question because I don't want to take your time. You're getting to your last minute. We'll give you the minute. What is the difference in sentencing if your theory is accepted? What do you want? You may not be able to give an exact figure, but roughly, what would the difference be in sentencing? Yes, roughly, Your Honor, the total offense level would go from a 32 to either a 16 or an 18. That was the request at sentencing in this case. And that would take the sentence, the current sentence is 90 months to, I don't have the range in front of me, Your Honor, but I believe it's around 20 months. What would he get? He got 90 months. 90 months. Yes. And what would he get under your range? I believe it's around the range of 21 months for half-gram amounts. Thank you. Thank you, Your Honor. Good morning. May it please the Court, Ms. McMillan. My name is Susan Cushman. I represent the United States. First, I just want to follow up on a question that the Court asked Ms. McMillan earlier. I just want to point out that Mr. Vieira did receive a departure from Judge Gilmour under 3553A factors, and basically she found that the defendant had worked hard to rehabilitate himself since this instant action, and she did depart from a guideline range or vary from a guideline range of 121 months down to 90. She, however, declined to apply the lower guideline range because she found that there was no sentencing entrapment. And the Court correctly based that decision on the trial record that Jerome Vieira was not someone who should be benefited by sentencing entrapment. She found that he was not coerced, that he showed no reluctance in the sales, and he was a willing participant. Her findings, which are contained in the supplemental excerpts of record on page 99 to 101, might be brief, but her findings are clearly based on the evidence that she heard at trial. Do you think there's a difference between the predisposition necessary to show entrapment as a defense and sentencing entrapment? I do. So when she said, as the trial evidence indicates, he's a willing participant, how do we know that she was differentiating between those two? Well, the trial, I think first for a sentence for entrapment just as a general defense, it goes more to the defendant's likelihood to commit crimes to begin with, commit drug-related crimes. And then the issue of sentencing entrapment, that would be more sort of predisposition. Those facts are developed during the course of the investigation. And, for example, here, once the investigation started, there is no evidence that Mr. Vieira was unwilling to engage in these sales. There were extensive recorded telephone calls that would start with a greeting or, you know, in the beginning setting up the deal, and that was usually a couple days before. And then there would be a phone call the day of the deal in which Mr. Segundo would ask Mr. Vieira, we all set, is this going to happen? And Mr. Vieira would, of course, confirm. And then there would be a recording talking about the deal. So you usually had, for each sale, three phone calls that happened. And at no time during any of those phone calls did Mr. Vieira ever say, excuse me, this is too much weight for me to produce. You know, I'm just a paper guy. I only sell, you know, small amounts. He always knew who to go from. He always had the product that he, that was requested, the amount that was requested. Counsel was arguing something to the effect that because he was an addict and he owed the money, that the government caused all this. It wasn't his fault. The government put this guy out there. It was like bait. And he grabbed the bait and he couldn't let go because he needed the drugs and he needed to pay off his debts. So he was a helpless victim of what the government set up for him. Well, Mr. Vieira had no debt. I mean, there's nothing in the record to indicate that he had any debt per se. And he was benefiting from this whole encounter by receiving methamphetamine, you know, from the people that he set up the deals with. So after every deal, there's evidence in the record that indicates they either went back to somebody's house and smoked methamphetamine or before the deal happened, he would take out some methamphetamine for himself and for the person that was supplying. I also want to point out to the court that all the defendants needed each other to complete these deals. For example, in the first sale, Mr. Moniz could not complete that sale without Mr. Militante. They went and they met Mr. Moniz. They all met at the Burger King. And then Mr. Moniz and Mr. Militante had to leave the Burger King and go and get the additional ounce of methamphetamine and come back to complete the sale. And the same thing with a sale in March that involved Mr. Militante, Mr. Binet, and Mr. Vieira. Again, Mr. Militante didn't have all the methamphetamine that was required for the deal, so he had to travel with Mr. Segundo, the snitch, to go to Mr. Binet's house to get the additional methamphetamine to come back to complete the sale. And Mr. Vieira had inserted himself in the middle of every one of these sales. I remember something in the record. I don't know which transaction it was that Vieira, on being approached to provide drugs, told the buyer—I can't remember his name offhand now, the names. Anyway, he told the buyer, here, here's the names. Why don't you deal direct? Isn't that an evidence that he didn't want to go ahead with these transactions? And then he was pressured further and further, but he initially told his— instead of being the supplier, he said, why don't you go direct? Here are the names. Go get them. Well, I think that—I think that if you look at the kind of pressure that has been applied to other defendants in these cases, for example, in Naranjo or Stouffer, you cannot compare that kind of pressure. First of all, this is— No, I'm not talking about the pressure. I'm talking about the assertions made by the defendant here who said, I don't want—I'll give you the names. You go do it. I don't want to do it. Well, those are the defendant's statements that—his own statements that he made on direct, and those are not the statements of any of the other witnesses. I mean, the other witnesses, the co-defendants who cooperated, and Mr. Segundo and the telephone calls that were played for the jury all belie that fact, and they show that he was a willing participant and that he would meet with these—he would meet— for example, he met with Mr. Moniz before the sale on November 26th to make sure that everything was set and that it would happen. Judge Gilmour said she sat through the trial and reviewed all the evidence. She didn't find that very credible, as I take it. That's correct, and I think one of the other reasons she didn't find it credible is because she heard Mr. Vieira say that he never received methamphetamine from any of these people after the sales, and witness after witness all said that they shared with him the methamphetamine that they received from the sales, and I think that was a point for her that changed— Well, it wasn't—and I don't know how you would analyze this, but it seemed to me every sale was X amount, and then he would—Vieira would take a piece out, and that's when he would use that distributing, either using it or giving it to his supplier or to his dealer. Correct. So that was his—I don't see that anybody else decided to do that. That was what he decided to do. That's right. So he was manipulating the deal in that respect. That's right. I agree with the court on that. It seemed to me that's what the judge was recognizing. And she made those findings, and those findings are in the record, and they are—they may be brief, not lengthy, but there are certain— the court can look to those findings to see how she made her decision or how she came to that ruling. How do we deal with—it wasn't argued here, but in the briefs the felon argues this predisposition issue. How do we deal with that? Well, I think that just because he might have, you know, sold usual amounts to friends at a certain period in time before this doesn't mean that he's incapable of graduating or stepping up the level after a while. Is that the test, you have to be incapable of graduating? No, it's not the test. That's my paraphrasing. That's what I'm asking. What's the test and how do we deal with it? I think that the court needs to look at what's happening during the investigation, what's going on. And during the investigation— No, no, no, no. What's the standard, I mean, that we're looking for? We know what's the standard. Well, that he intended to produce the requested amount of meth and that he had the ability to produce the requested amount of meth. That's the test, if you will. Well, and Judge Gilmer found that he was not a reluctant person. Does that go into the analysis? It does because I think it shows his predisposition that he's not reluctant, that he's ready to engage in this, that he intends to produce this and he has the ability to produce it, and he does, in fact, produce it. So it's not like a golf game, a predisposition of drug addicts who got their handicap, I'm just a paper drug addict? I think that if the court were to rule that way, it would be allowing the court to hide, allowing potential defendants to hide behind a defense and they could all later say, hey, I'm just an addict. I didn't mean for this six-pound sale to happen, really. And I think that would be setting sort of a bad precedent in the future to go down that path. How would you explain the second sale, then? You might use that for the first sale, but he did six sales, and I think that was mentioned by the judge also. Right. And the second sale, he was asked for an ounce, and he was only able to produce half an ounce. And that might very well be just because his other source of supply maybe didn't have the additional half ounce. But if the court looks to each of the sales, not every single person was always able to come up with the amount of drugs by themselves. They all worked together in a group. They all helped each other out. Pee-wee Militante helped out Mr. Moniz. Dunstan Binet helped out Pee-wee Militante. Kenneth Meyer helped out Jerome Vieira. And they were all friends, and they all grew up together, and they all used drugs together, and they all benefited from each other's activities. The problem with cursory findings, though, is that it leaves us in a tough position. And I understand the difficulties district courts face, but here it's hard to know whether the judge really differentiated between classic entrapment as liability and sentencing entrapment. The predisposition, it seems to me, is different. There's a predisposition to commit a crime, and there's a predisposition to commit a crime at a set amount. How do you think this record supports the conclusion that the district court was differentiating between the two? I think when she talks about hearing the testimony from the witnesses at trial and she makes those credibility findings based on those witnesses, I think that that's how she does it. I mean, I agree with Your Honor that there's not a specific statement by her that says, you know, sets out, okay, this is the predisposition for entrapment, this is the predisposition for sentencing. I mean, she doesn't specifically set out that standard, but I think that if you look... Well, here's what she says. The court listened to all the testimony. What I have seen is not that Mr. Vieira was coerced into doing this or that it was something he was reluctant to do. I see a person who's heavy into drugs, concerned about his supply, not only in terms of meth but in terms of marijuana, and he went along with all these different occasions, six different occasions of being part of drug buying and selling. To me, that seems to go either way. I mean, it's more likely to go to the defense of entrapment. It doesn't speak to amount. It just speaks to the transactions. Right, but... It doesn't go to amount, but the case law doesn't require, Naranjo doesn't require and Stauffer doesn't require that the court find a specific amount, say that I find the defendant was only predisposed to deal in these amounts. That's not required under the case law, so I don't think that she needs to make that ruling as to the amount. But if that's true, then what's the difference between classic entrapment and sentencing entrapment? If it has nothing to do with quantity, then what's the difference? Well, I mean, with classic entrapment, you have the five, you know, you have those, as outlined in McClellan, you have the five points that you need to work through, and, you know, the most important point is the defendant's sort of likelihood or, you know, prior predisposition, if you will, to engage in those criminal activities. And with sentencing entrapment, you really only have the two standards that you have to fulfill, the, you know, intend to produce the requested amount and the ability to produce the requested amount. So there's going to be some overlap. I mean, it's not, you know, one or the other. I mean, I think it's fair to make, you know, I think it's common that people would raise entrapment at trial and perhaps sentencing entrapment at sentencing. I don't think that that's unusual. No, no, no, not at all, but there has to be a difference, and it's a difference in finding, it seems to me. It can't be coextensive, the analysis. The analysis can't be coextensive, otherwise there's no point to sentencing a trial when you lose a trial on entrapment and that's the end of it. Well, I agree, but, I mean, you know, a trial, the jury, the jury's going to make those findings. The jury's going to find that the defendant was not trapped as a matter of law, and it's going to kind of move on from there. But, and here the court is, you know, calling on the evidence that she heard at trial to help her make that decision. I mean, I agree it is a little bit blurred in the record there where she makes that distinction, but I think that given the overlap between the two, that's not unreasonable. I think the court can still look to see why she made the decision that she made based on the evidence that she heard at trial and testimony of the witnesses, and those witnesses did, in fact, contradict what Mr. Vieira said at trial in his testimony. Well, a predisposition, he was predisposed to sell drugs. That's a fact. I mean, I don't think he even admits that. And it's a question here, it sounds like we're trying to say that sentencing entrapment is putting a handicap on a dealer. If I'm an ounce dealer, I'm always an ounce dealer. That's my handicap. I can't play a better game than that. And that isn't what happened here. The judge says, and I don't know if this fits the analysis in the case, so I'm going to go back and check, but it sounds like you don't have a handicap when it comes to a sentencing entrapment because at that point if you're willing to go forward and you have the capability of producing it and you have the disposition to go forward with the transaction because it's a bigger sale, it has nothing to do with a handicap. It seems like we're trying to put some limitation on the drug dealer on what he can do when it comes to sentencing rather than what he intended to do and what he could do. Now, if they twisted his arm and hung him by the neck and forced him to do it, that isn't in this record that I can see. No, it's not. Otherwise, everybody would always have a free pass and they could always raise sentencing entrapment later and say, hey, I didn't mean to do this. What about waterboarding? Well, there was no waterboarding in this case, nor were there any reverse gangs, nor was there anybody saying, hey, we'll buy back five kilograms and you can just pay us for one, which are the facts in Naranjo and Stouffer, so it's a little bit different. All right. Thank you very much. Thank you. I will give you one minute. Thank you, Your Honor. Just briefly, we think that this issue of predisposition is critical to our issue on appeal. You have the predisposition which is associated with classic entrapment and predisposition that's discussed by this court in Naranjo and Stouffer with respect to sentencing entrapment. The predisposition that we want this court to follow, of course, is the predisposition that's set out in Naranjo and Stouffer. That notion of predisposition looks to what was this defendant doing prior to the activities underlying the offense. The record shows, I know that Judge Gilmour says the record's uncontradicted, but she's just wrong there. The record is. . . No, I think she said it was contradicted. Excuse me, Your Honor. She says it's contradicted. The record is uncontradicted, that prior to these deals where the FBI gets involved with the snitch, Mr. Vieira was just an addict, and he was selling and dealing these small user amounts to fuel his addiction. The testimony of Kenneth Meyer is consistent with this. Kenneth Meyer says, yeah, Jerome and I used to. . . Jerome used to acquire drugs from me. I used to acquire drugs from Jerome, small paper amounts. Kavika Moniz says the same thing. We've been friends since high school. Small user amounts exchanged between us for 10 years of no more than papers. Even the testimony of the government's lead agents, Timothy O'Malley, the FBI case agent, and Mr. O'Malley's supervisor, Dan Kelly, they say that Mr. Vieira was never the target of Kama'aina Travel, which was the big government investigation into drug trafficking on the North Shore. It was David Moniz, and somehow Mr. Vieira got sucked into this whole thing. So we think that the record is uncontradicted. Judge Gilmour was wrong. That was true up to the first sale. Excuse me, Your Honor. That was true up to the first sale. Up to the first sale. Yes, Your Honor. And the third and the fourth and the fifth. By the way, Your Honor, as to that. . . How do you explain that? As to that first sale, Your Honor, you know, this is part of the problem that the court underlines in the Stauffer cases. You've got that first sale for 60 grams. Why didn't the government stop it there? Well, I understand that point, but when you're talking about predisposition for larger amounts. . . Yes. I think your argument gets weaker as the number of sales go up. Yes. We admit, Your Honor, the six sales is a troubling aspect of this case. However, the court has provided us with the doctrine of sentencing entrapment that applies in this case. With respect to Mr. Vieira's behavior before the six deals, the record is uncontradicted that he only engaged in half-gram amounts. We urge the court to reverse sentencing and remand. Thank you, Your Honors. Thank you. The next case on the calendar is United States v. Jones. Thank you.
judges: Reinhardt, Brunetti, Thomas